CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

DEC 27 2022

LAURA A. AUSTIN, CLERK
BY:  s/ H. MCDONALD
      DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| DARRELL H.,[1] | ) | |
| Plaintiff, | ) | Civil Action No. 4:22-cv-00002 |
| v. | ) | |
| | ) | REPORT & RECOMMENDATION |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social Security, | ) | By:  Joel C. Hoppe |
| Defendant.[2] | ) | United States Magistrate Judge |

Plaintiff Darrell H. asks this Court to review the Commissioner of Social Security's final

decision denying his claim for supplemental security income ("SSI") under Title XVI of the

Social Security Act, 42 U.S.C. §§ 1381–1383f. The case is before me by referral under 28 U.S.C.

§ 636(b)(1)(B). Having considered the administrative record, the parties' briefs, and the

applicable law, I cannot find that substantial evidence supports the Commissioner's denial of

benefits. Accordingly, I respectfully recommend that the presiding District Judge reverse the

decision and remand the case under the fourth sentence of 42 U.S.C. § 405(g).

## I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 1383(c)(3); § 405(g); *see*

*also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials.

[2] Acting Commissioner Kijakazi is hereby substituted as the named Defendant in this action. 42 U.S.C. §
405(g); Fed. R. Civ. P. 25(d).

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe medical impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an

impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work existing in the economy. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 416.920(a)(4).[3] The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

On September 24, 2019, Darrell filed for SSI alleging that he was disabled by autism, headaches, and hyperactivity, and not "lik[ing] to be closed in." *See* Administrative Record ("R.") 63, 170–77, ECF No. 10. He was twenty-four years old, or a younger person under the adult regulations, on his application date. R. 63; 20 C.F.R. § 416.963(c). Darrell had been awarded childhood disability benefits based on Asperger's syndrome, but those benefits were terminated under the adult disability standards when he turned eighteen years old in 2013. R. 84; *see* R. 64. Disability Determination Services ("DDS"), the state agency, denied Darrell's adult SSI claim initially in November 2019, R. 63–74, and upon reconsideration in February 2021, R. 76–95. That September, Darrell appeared with counsel and testified at an administrative hearing before ALJ H. Munday. *See* R. 42–62. A vocational expert ("VE") also testified at the hearing. R. 59–61.

ALJ Munday issued an unfavorable decision on September 27, 2021. R. 10–21. At step two, ALJ Munday found that Darrell had a "severe" impairment of autism. R. 12. His other alleged medically determinable impairment ("MDI"), headaches, was a non-severe impairment

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

during the relevant period. *Id.* Darrell's severe autism did not meet or medically equal the relevant Listing because it did not cause an "extreme" limitation in one or a "moderate" limitation in two of the broad areas of mental functioning. *See* R. 13–14 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.10). Rather, that impairment caused "moderate" limitations in Darrell's overall capacities for understanding, remembering, or applying information; interacting with others; concentrating, persisting or maintaining pace; and adapting or managing himself. R. 13.

ALJ Munday then evaluated Darrell's residual functional capacity ("RFC") and found that he could "perform a full range of work at all exertional levels," but with certain nonexertional limitations. R. 14. He could perform "simple, routine tasks"; he could have "no interaction with the general public," but "occasional interaction with co-workers"; and he could "perform 'low stress' work, which is defined as occasional independent decision making and occasional workplace changes." *Id.* Darrell did not have any past relevant work. R. 19. Based on her RFC finding and the VE's hearing testimony, however, ALJ Munday found that Darrell could perform certain unskilled occupations that offered a significant number of jobs in the national economy, including laundry folder, hand packer, and bus cleaner. R. 20–21 (citing R. 60). Thus, ALJ Munday concluded that Darrell was not disabled at any time after September 24, 2019. R. 21. The Appeals Council declined to review that decision, R. 1–3, and this appeal followed.

### III. Discussion

Darrell challenges two aspects of ALJ Munday's mental RFC determination. *See generally* Pl.'s Br. 4–9, ECF No. 15. First, he argues that ALJ Munday failed to explain how the RFC finding captured the ALJ's earlier finding that Darrell had "moderate" limitation in his overall ability to sustain concentration and persist in tasks at an acceptable pace. *See* Pl.'s Br. 4–

6 (citing *Mascio v. Colvin*, 780 F.3d 632, 637–38 (4th Cir. 2015)). Second, Darrell argues that

ALJ Munday erred by failing to include in the RFC anything about Darrell's "limitation in

ability to work without special supervision." Pl.'s Br. 7–10. Relatedly, he argues that the ALJ

erred by failing to consider the first DDS reviewing psychologist's opinion that Darrell "is

moderately limited in his ability to sustain an ordinary routine without special supervision." Pl.'s

Br. 7 (citing R. 70); *see also* R. 88–89 (same). These arguments are generally persuasive.

*

A claimant's RFC is his "maximum remaining ability to do sustained work activities in

an ordinary setting" for eight hours a day, five days a week (or equivalent schedule) despite his

medical impairments and related symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

It is a factual finding "made by the [ALJ] based on all relevant evidence in the case record,

*Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it should reflect specific,

credibly established "restrictions caused by medical impairments and their related symptoms"

that affect the claimant's "capacity to do work-related physical and mental activities" on a

regular and continuing basis. SSR 96-8p, 1996 WL 374184, at *1–2 (July 2, 1996). *See Mascio*

*v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015). The ALJ's written decision "must include a

narrative discussion" describing how specific, relevant evidence "supports each conclusion" in

the RFC assessment, *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (quotation marks

omitted), and logically explaining how the ALJ weighed other "evidence that points to a

claimant's disability." *Stoker v. Saul*, 833 F. App'x 383, 386 (4th Cir. 2020) (citing *Lewis*, 858

F.3d at 869). *See, e.g.*, *Lewis*, 858 F.3d at 869 (remanding where the ALJ impermissibly

"cherrypick[ed] facts" supporting his "finding of nondisability while ignoring evidence that

point[ed] to a disability finding" and failed to explain how the cited facts reasonably supported

5

specific RFC findings).

An ALJ's conclusion that the claimant's RFC renders him "not disabled" will, by definition, "implicitly contain[] a finding" that the claimant is mentally and "physically able to work an eight hour day" five days a week. *Hines*, 453 F.3d at 563 (citing SSR 96-8p, 1996 WL 374184, at *1); *see, e.g.*, *Elgie B. v. Saul*, Civ. No. TMD-19-847, 2020 WL 2490106, at *6 (D. Md. May 14, 2020). The ALJ's failure to expressly evaluate the claimant's remaining ability to "perform certain functions . . . for a full workday," *Mascio*, 780 F.3d at 637, may be reversible error if it frustrates meaningful judicial review. *See, e.g.*, *Monroe v. Colvin*, 826 F.3d 176, 188 (4th Cir. 2016) (reversing in part because the ALJ "never made specific findings about whether Monroe's [severe] apnea or narcolepsy would cause him to experience episodes of loss of consciousness or fatigue necessitating breaks in work and if so, how often these events would occur"). Nonetheless, it is generally the claimant's burden to identify "functional limitations that should have been included in the RFC" finding, *McAnally v. Astrue*, 241 F. App'x 515, 518 (10th Cir. 2007); *see also Hartman v. Colvin*, No. 5:13cv109, 2015 WL 877360, at *7 (W.D. Va. Mar. 2, 2015), and to explain why the ALJ's failure to include those limitations is reversible error, *see Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014).

A.    *Relevant Evidence*

Darrell alleged that he is disabled by autism, hyperactivity, and headaches. R. 63. In November 2019, he completed an Adult Function Report indicating that these conditions affected his ability to remember things, complete tasks, and follow instructions, R. 256. *See generally* R. 251–58 (Ex. 8E). He did not need reminders when it came to his own self-care, *see* R. 252–53, but he did need reminders to go places, and he needed someone to accompany him when he left the house, R. 255. Otherwise, he did not spend time with people besides family

members. *See* R. 251, 255. Darrell got along with authority figures "pretty well," and he did

"fine" with changes in routine. R. 257. He could handle stress "somewhat" and follow spoken

instructions "a little bit." *Id.* He could pay attention for fifteen minutes. R. 256. He did not follow

written instructions "to[o] well." *Id.*

In September 2021, Darrell testified that he could not keep a full-time job "because, when

I am working, sometimes . . . I do just lose focus and I will get, like, lost in the moment. . . .

Sometimes I'll just lose my focus." R. 53; *see also* R. 54 ("I would eventually focus back on the

task."). He needed help staying on task in school, R. 48, and he had been fired from a part-time

job making pizzas, R. 241, because he had trouble following directions and keeping the toppings

straight, R. 54 ("[M]aking pizzas was a lot difficult because all the toppings."). Darrell was

twenty-six years old, R. 47, and had never lived alone. R. 55. At the time, he lived with his

grandfather and helped with "little things" around the house. *Id.* His grandfather reminded him to

mow the grass, R. 58, and to feed the dog because Darrell would forget about her, R. 54–55.

Darrell typically interacted with other people through an online gaming platform rather than in

person. *See* R. 56–57. He would "probably play [online] for two hours" before losing interest. R.

57.

Darrell received special-education services to accommodate his autism starting in

elementary school. R. 196; *see generally* R. 191–97 (Ex. 1E) 198–205 (Ex. 2E), 207–08 (Ex.

3E), 210–26 (Ex. 4E). His 2013–2014 individualized educational program ("IEP") shows that he

spent about one-third of his school week in a self-contained classroom receiving "intensive

instruction" on core academic subjects in a "small group setting." R. 224. He spent the rest of his

time in a general-education classroom, but he still required additional support from an

instructional assistant. R. 223–24; *see* R. 207. Darrell also received "extended time (not to

exceed time and a half) on all assignments and assessments," R. 216, and "require[d] instructional supports" to accommodate his "difficulties with organization," R. 217. His teachers checked his agenda book "at the end of each class to be sure he ha[d] the correct assignment written down." R. 217. In 2003 and 2005, his performance on the Wechsler Intelligence Scales for Children revealed an IQ of 89–90, placing him in the 23rd to 25th percentiles, R. 195, and a speed-of-information processing score of 75, placing him in the 5th percentile, *id. See* R. 197 ("Cognitively, previous testing indicates that Darrell is functioning in the average to low average range."). In early 2012, Darrell's standardized test "scores were within the average range," R. 210, for broad reading, broad writing, broad math, and oral language, R. 190. But he also "worked very slowly during this assessment." R. 193. He got "every question/problem correct" in some sections, but he would finish only "a few questions because of how slow he worked." *Id.*

In March 2013, Darrell's case manager and "inclusion" classroom teacher, R. 198, noted that he was "a very intelligent young man who has issues expressing himself through writing," R. 205. "Organization and focus [were] also major issues for Darrell." *Id.* He "rarely d[id] any homework in any of his classes," and he had "issues staying focused during class, often appear[ing] to 'daydream.'" R. 200. On a "daily" basis, Darrell had "a very serious problem" sustaining attention during play/sports activities and organizing school materials, and he had a lesser, but still "serious" problem refocusing to task when necessary and completing work accurately without making careless mistakes. *See id.* (evaluating the frequency and severity of Darrell's "problems functioning" in the "Attending and Completing Tasks" domain when "compared to the functioning of same-aged children without impairments").

In May 2013, when Darrell was eighteen years old, Teresa Trabue, Psy.D., conducted a psychological assessment in connection with a prior disability claim. *See generally* R. 294–96

(Ex. 1F). Dr. Trabue noted that Darrell's memory and understanding were intact on exam, but he "sometimes need[ed] repetition which seemed related to concentration." R. 295. "Some of his communication was off topic and he had difficulty being concise and precise," which also "appeared associated with concentration, organization, and his general detail orientation." *Id.* "Darrell recalled digits forward to 6 places and backward only to 2 [places]. Serial recall was slow but accurate. Abstractive capacity appeared to be loosely intact based on 3.5 out [of] 5 correct interpretations of common idioms." R. 295–96. "[W]hen he did not know the answer he said, 'I don't remember that one' or 'I heard all these [idioms] before but I don't know what they mean.'" R. 296. Dr. Trabue noted that "Darrell's history and presentation" on that day's exam were consistent with a diagnosis of Asperger's syndrome. She opined that he "continue[d] to require adult supervision and guidance and [was] not yet able to live independently." R. 296.

In November 2019, Christopher Cousins, Ph.D., evaluated Darrell in connection with this adult SSI claim. *See* R. 299–302 (Ex. 2F). Darrell's facial expressions were "blank throughout the entire evaluation," and he spoke in an "almost robotic manner with no influx in his voice." R. 301. He kept his sunglasses on during the evaluation "despite the fact that it [was] not at all bright" in Dr. Cousins's office, R. 300, and he was "completely oblivious as to how this was inappropriate giv[en] the context of the evaluation," R. 302. On exam, Darrell performed "one correct sequence of serial 7's, calculate[d] the change he would receive if he purchased at 35-cent item with a dollar, and solve[d] a problem requiring him to divide 4 into 20." R. 301. He could not "solve a problem requiring multiple mental calculations." *Id.* Darrell "knew the similarity between a piano and drum and a partial similarity between a horse and tiger and the nose and tongue, but he did not know the similarity between food and gasoline [or] between a poem and statue." *Id.* Additionally, although it was "clearly explained to Darrell at the

9

conclusion of the examination that he had completed the requirements of the evaluation and was free to go home," he came back about a minute later and knocked "loudly" on Dr. Cousins's office door and "asked if anything else was required for him related to the evaluation." *Id.*

Dr. Cousins noted that Darrell's "clinical presentation was consistent throughout the evaluation and consistent with information contained in records available for review." R. 302. Based on that information, Dr. Cousins opined that Darrell "appear[ed] capable of performing simple and repetitive tasks," but it was unlikely he could "perform detailed and complex tasks and [he] may require special instructions or additional supervision." *Id.* He expected that Darrell would "have approximately mild difficulty performing work activities on a consistent basis and completing a normal workday or work week without interruption." *Id.* Darrell appeared "capable of accepting instructions from a supervisor" given that he "coorperat[ed] to the best of his ability during this evaluation." *Id.* Nevertheless, Dr. Cousins "strongly suspect[ed] he would not be able to effectively interact with coworkers in the public. He would also be expected to have difficulty coping with the typical stressors encountered in competitive work." *Id.*

Two DDS psychologists also reviewed Darrell's records in connection with this claim. R. 63–75, 76–94. In November 2019, Joseph Leizer, Ph.D., opined that Darrell's severe autism spectrum disorder, R. 67–68, resulted in "moderately limited" abilities to do several specific work-related tasks or activities, including following "detailed instructions," "maintain[ing] attention and concentration for extended periods," "sustain[ing] an ordinary routine without special supervision," "perfom[ing] at a consistent pace" without taking "unreasonable" breaks, and "respond[ing] appropriately to changes in the work setting." R. 70–71. Asked to "explain in narrative form" how he evaluated Darrell's "capacities and/or limitations" in each functional area, Dr. Leizer wrote: "Sporadic and brief history of work tasks and [history] of poor school

performance. Able to complete simple tasks and respond to simple questions. Difficulty with

general knowledge and multistep calculations." R. 70, 71.

Ryan Mendoza, Psy.D., affirmed Dr. Leizer's mental RFC assessment—including his

"narrative" explanations—after reviewing Darrell's records in February 2021. R. 87–90. Dr.

Mendoza's report included more detailed "Additional Explanation" section stating that Darrell

could do "simple routine tasks"; could "sustain [concentration, persistence, or pace] for [those]

tasks, within above restrictions, for periods of at least 2 hours at [a] time" to "complete a normal

workday/workweek[] despite occasional interruptions" from his symptoms; could "establish and

maintain appropriate relationships while having infrequent interaction w[ith] peers and

supervisors," but should have "limited" interaction with the public; and could "adapt to routine,

not frequent or intense workplace stress/changes." R. 90. He did not cite any supporting evidence

or otherwise explain how he reached those more specific conclusions. *See id.*

B.      *The ALJ's Findings*

ALJ Munday discussed much of this evidence throughout her written decision. R. 13–19.

At step two, she found that Darrell's diagnosed autism was a "severe" MDI because it caused

"greater than minimal limitation in [his] ability to perform basic work activities," R. 12, which,

according to the regulations, include things like understanding, remembering, and following

"simple instructions," exercising judgment, responding appropriately to supervision, co-workers,

and usual work situations, and dealing with changes in a routine work setting, 20 C.F.R. §

416.922(b)(3)–(6). At step three, she found that this disorder caused "moderate limitations" in

Darrell's capacities for understanding and remembering or applying information; interacting with

others; concentrating, persisting, or maintaining pace; and adapting, or managing himself. R. 13.

In explaining how she concluded that Darrell had a moderate limitation with maintaining

concentration, persistence, or pace ("CPP"), ALJ Munday acknowledged his testimony that he could not "maintain employment due to difficulties with concentration and focus and he reportedly need[ed] reminders to complete household chores." *Id.* Darrell "also exhibited behaviors consistent with distractibility and impaired attention during his consultative exams" in 2013 and 2019, R. 13 (citing Exs. 1F, 2F), and his teachers "noted similar concentration issues" when he was in high school, *id.* (citing Exs. 2E, 4E). "Nonetheless," ALJ Munday concluded "the record also indicate[d] that [Darrell] is able to focus sufficiently for simple and routine tasks; he could complete serial sevens during his consultative exam albeit slowly." *Id.* (citing Exs. 1F, 2F). Darrell also "testified that he is able to focus on his computer games for two-hour intervals." *Id.* "In sum, [that] information support[ed] a moderate limitation in concentration, persisting or maintaining pace." *Id.*

ALJ Munday then summarized Darrell's testimony describing his symptoms and functional limitations, R. 14–15; the relevant portions of his IEP and other educational records, R. 15–16; Dr. Trabue's findings on the 2013 exam, R. 16–17; Dr. Cousins's findings on the 2019 exam and his medical opinion about Darrell's work-related abilities and limitations, R. 17, 18–19; and the DDS psychologists' medical opinions, R. 19. As part of her RFC assessment, she found that Darrell's severe autism could "reasonably be expected to cause [his] alleged symptoms," but that his statements describing "the intensity, persistence and limiting effects of th[o]se symptoms [were] not entirely consistent with the medical and other evidence in the record for the reasons explained in [her] decision." R. 17.

First, ALJ Munday found that "the evidence of record [was] only partially consistent" with Darrell's "statements regarding his inability to focus or follow instructions." *Id.* Darrell's "difficulties with organization, attention span, and complex instructions [were] evident based on

notes from his teachers and [both] consultative examiners." *Id.* (citing Exs. 2E, 4E, 1F, 2F).

"However, [his] cognitive testing and standardized testing of record documents at least average

intellectual aptitude." R. 17–18 (citing Ex. 4E). *But see* R. 193, 197, 210. Second, she found that

Darrell "demonstrated intact understanding for simple tasks during [both] consultative

examinations, . . . wherein he only demonstrated difficulties with *higher level* abstract thinking

and *complex mathematical* equations." R. 18 (emphasis added) (citing Exs. 1F, 2F). *But see* R.

295 ("Abstractive capacity appeared to be loosely intact based on 3.5 out [of] 5 correct

*interpretations of common idioms*." (emphasis added)); R. 301 (Darrell could "solve a problem

requiring him to divide 4 into 30," but he could not "solve a problem requiring *multiple mental*

calculations," and he "knew the similarity between a piano and drum and *a partial similarity*

between a horse and tiger and the nose and tongue, but he did not know the similarity between

food and gasoline [or] between a poem and statue" (emphasis added)).

ALJ Munday also found that Darrell's "presentation throughout the record" and his

"educational accommodations" suggested that he was "likely limited in his capacity" to follow

"complex and detailed instructions performed in a stressful or time limited setting." *Id.* (citing

Exs. 2E, 4E, 1F, 2F). His "demonstrated abilities and past academic performance," on the other

hand, showed that he could "sustain unskilled work in a 'low stress' work setting," *id.*, involving

only occasional workplace changes and independent decision-making, R. 14. She did not explain

why Darrell's "past academic success" in a "partially controlled setting" where he received up to

50% extra time to complete all tasks and assessments and other structural supports, R. 19; *see* R.

16, undermined Darrell's testimony that he needed help staying on task in school, R. 48, or that

he could not complete routine work tasks at an acceptable pace for eight hours a day, five days a

week, *see* R. 54.

As for the opinion evidence, ALJ Munday found Dr. Cousins's evaluation "persuasive" because he "specifically noted supporting information in his reasoning" and his assessment of Darrell's social limitations was consistent with Darrell's "atypical" behavior on both consultative exams. R. 19 (citing Exs. 1F, 2F). She also noted that Darrell "performed successful[ly] in school in a partially controlled stetting where additional time [was] allotted for assignments and assessments," which she apparently found to be consistent with Dr. Cousins's opinion "as it relates to [Darrell's] ability to perform simple low stress work." R. 19 (citing Exs. 2E, 4E). ALJ Munday "was not persuaded by [Dr. Cousins's] assessment to the extent that [he] did not explicitly define what [he] meant by 'mild' limitation on a function-by-function basis and he did not describe the extent of supervision required in the workplace." *Id.* (citing R. 302). ALJ Munday also explained that Dr. Leizer's opinion that Darrell could "complete simple tasks and respond to simple questions," but would have "difficulty with general knowledge and multistep calculations," and had "abnormal social interactions" was only "partially persuasive" because it was "partially consistent and partially supported." R. 19. Darrell did "exhibit[] intact capacity for simple tasks during his consultative exams," *id.* (citing Exs. 1F, 2F), but Dr. Leizer did not "specify the extent of [Darrell's] social limitations on a function-by-functions basis," *id.* Finally, ALJ Munday found that Dr. Mendoza's opinion was "more persuasive" than Dr. Leizer's opinion "based on its specificity" in the "Additional Explanation" section. *See* R. 19. She noted that Dr. Mendoza's opinion "align[ed] with" Dr. Cousins's opinion, "which [she] also found to be persuasive." *Id.* Nevertheless, she did not address whether Dr. Mendoza presented relevant "objective medical evidence and supporting explanations . . . to support" his more specific opinions, and if so, how that "supportability" factor influenced her apparent finding that Dr. Mendoza's opinion, like Dr. Cousins's opinion, was "persuasive," 20 C.F.R. § 416.920c(b)–(c).

*See* R. 19. Nor did she mention Dr. Trabue's medical opinion that Darrell still "require[d] adult

supervision and guidance and [was] not yet able to live independently" at age eighteen. R. 296;

*see* 20 C.F.R. § 416.920c(b).

Ultimately, ALJ Munday concluded that Darrell's "autism, though limiting, was not

disabling." R. 15. Rather, Darrell could do "simple, routine tasks" in a "'low stress' work"

setting, meaning only "occasional independent decision making and occasional workplace

changes," and he could have "occasional interaction with co-workers,"[4] but no interaction with

the public. R. 14. ALJ Munday based that RFC "on the foregoing, including the opinion

evidence, the cognitive testing, academic records, and clinical exams," all of which indicated that

Darrell "struggle[d] with higher level concepts and maintaining appropriate social functioning,

but he [did] understand simple tasks and [could] sustain attention for routine tasks." R. 19. She

implicitly rejected further allowing Darrell to "be off-task 15% of the time," R. 60, which the VE

testified would eliminate all work in the economy, *see* R. 60–61. *See* R. 14, 20. Nor did she limit

Darrell's ability to sustain a low-stress work routine without requiring extra supervision, *see* Pl.'s

Br. 7–9 (citing R. 70, 296), or other supports not typically found in a competitive workplace, *see*

*e.g.*, R. 54–55, 58, 217, 223–24, 255, 296.

C.    *Analysis*

Darrell first argues that the ALJ's RFC determination, R. 14, failed to account for her

earlier finding that Darrell's severe autism caused a moderate limitation in his overall capacity to

maintain concentration, persistence, or pace, R. 13. *See* Pl.'s Br. 4–6. This argument stems from

the Fourth Circuit's decision in *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015). As relevant here,

---

[4] "'Occasional[ ]' means occurring from very little up to one-third of the time" and "should generally total
no more than about 2 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983).

*Mascio* holds that an ALJ who at step three finds the claimant's mental MDI causes at least a "moderate" limitation in his general ability to maintain CPP must either specifically account for that work-related limitation in the RFC finding or explain why such a restriction is unnecessary. 780 F.3d at 638. Restricting the claimant to "simple, routine tasks or unskilled work," without additional explanation, is not sufficient because "the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for the claimant's [moderate] limitation in concentration, persistence, or pace." *Id.* (internal quotation marks omitted). Thus, the ALJ's written decision must include a narrative discussion, citing relevant evidence in the record, explaining either how the RFC reflects the ALJ's finding that the claimant's mental MDI causes "moderate" (or more) overall limitations sustaining CPP or why, notwithstanding that prior finding, this limitation "does not affect" the claimant's ability to "stay on task" for a full workday and normal workweek. *Id.*; *see, e.g., Lonie B. v. Comm'r of Soc. Sec. Admin.*, No. DLB-19-1424, 2020 WL 2097683, at *4 (D. Md. May 1, 2020) (remanding under *Mascio* where ALJ discussed relevant medical evidence, but "offered no explanation as to why Plaintiff's issues with concentration or persistence did not affect his ability to sustain work over an eight-hour workday").

ALJ Munday concluded that Darrell could "sustain attention for routine tasks" despite his overall moderate limitations with CPP. *See* R. 19. The problem, however, is that she did not provide an accurate, logical explanation showing *both*: (i) how specific relevant evidence supported that conclusion; *and* (ii) why she apparently rejected other evidence that either undermined her conclusion that Darrell could "sustain attention" for routine tasks or supported Darrell's claim that he could not persist in those routine tasks at an acceptable pace for eight hours a day, five days a week. *See Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir.

16

2020) ("[W]e do not reflexively rubber-stamp an ALJ's findings. To pass muster, ALJs must build an accurate and logical bridge from the evidence to their conclusions." (cleaned up)).

For example, ALJ Munday did not explain why Darrell's testimony describing "his inability to focus" enough to maintain full-time work, R. 19; *see* R. 15 (citing R. 53), was "only partially consistent" with his "difficulties with organization [and] attention span" evident throughout the record, R. 19 (citing Exs. 2E, 4E, 1F, 2F). The ALJ acknowledged Dr. Trabue's finding that Darrell needed things repeated on exam, which "seemed related to concentration," R. 295; Dr. Cousins's finding that Darrell could not "solve a problem requiring multiple mental calculations," R. 301; a high school teacher's opinion that Darrell had "major" problems, R. 205, "staying focused during class, often appear[ing] to 'daydream,'" R. 200; the fact that Darrell had an IEP providing "extended time . . . on all assignments and assessments" and specific "instructional supports in order to access the general curriculum," R. 216–17; and Darrell's testimony that he needed "help staying on task" in school despite those accommodations, R. 48. *See generally* R. 15–17. Yet, she did not explain how any of that evidence factored into her conclusion that "the evidence of record [was] only partially consistent," R. 17, with Darrell's testimony "that he is unable to maintain full-time employment because he loses focus" and "that he would need someone at his job to remind him to do things," R. 15 (citing R. 53). "This conclusion [is] not supported by substantial evidence because the record, when read as a whole, reveals no inconsistency between the two." *Hines*, 453 F.3d at 565. Nor did she explain why Darrell's "average intellectual aptitude," R. 18 (citing Ex. 4E), and "intact understanding for simple tasks" on two mental status exams, *id.* (citing Exs. 1F, 2F), shed any light on Darrell's distinct "ability to stay on task" during a normal workday and workweek, *Mascio*, 780 F.3d at 638.

Additionally, while ALJ Munday concluded Darrell could "sustain attention for routine tasks," R. 19, or "unskilled work in a 'low stress' work setting," R. 18, she did not specifically address his remaining ability to persist in those tasks or to complete them at an acceptable pace for eight hours a day, five days a week, *see Mascio*, 780 F.3d at 638.[5] "The missing analysis is especially troubling," *Mascio*, 780 F.3d at 638, because Darrell's record contains evidence that he may become overwhelmed even by routine tasks like putting toppings on a pizza, R. 54, 251; that, despite exhibiting "intact understanding for simple tasks" on formal assessments, R. 18, he was "slow" or "very slow" to complete those tasks, R. 193, 295–96; that in school he received up to 50% extra time to complete "all assignments and assessments," including those given in a self-contained setting, R. 216; and that, even with those accommodations, Darrell "rarely d[id] any homework in any of his classes" and he struggled to stay "focused during class, often appear[ing] to 'daydream,'" R. 200. All these errors frustrate meaningful judicial review. *Cf. Seymour v. Berryhill*, No. 3:16-cv-62, 2017 WL 908213, at *3–4 (W.D. Va. Mar. 6, 2017) (reversing and remanding under *Mascio* where ALJ failed to explain how RFC limiting claimant to "simple, routine and repetitive tasks; . . . a static work environment where changes in tasks are infrequent and explained when they do occur; and occasional contact with the public, supervisors and coworkers" reflected ALJ's finding of "moderate" limitations maintaining CPP).

Next, Darrell argues that ALJ Munday erred because her RFC finding does not reflect his limited "ability to work without special supervision," which was supported by Dr. Leizer's opinion that Darrell was "moderately limited in his ability to sustain an ordinary routine without

---

[5] To the extent that ALJ Munday might have credited Dr. Mendoza's unexplained opinion that Darrell could "sustain concentration, persistence, and pace for [the] above tasks, within above restrictions [sic] for periods of at least two hours at a time, throughout the day, to complete a normal workday/workweek," R. 19 (citing R. 90), she did not articulate that finding in the manner that the Commissioner's regulations expressly require, 20 C.F.R. § 416.920c(b)–(c).

special supervision," Pl.'s Br. 7 (citing R. 70), as well as Dr. Cousins's opinion that Darrell "*may*
require special instructions or additional supervision," R. 302. *See* Pl.'s Br. 7–9. It was not
necessarily unreasonable for ALJ Munday to discount this aspect of Dr. Cousins's opinion
because the opinion "did [not] describe the extent of supervision [Darrell] required in the
workplace." R. 19; *see* 20 C.F.R. § 416.920c(b)–(c). The problem is that ALJ Munday did not
explain how she considered *other* evidence showing that Darrell generally functioned in a more-
supervised, structured environment where he received specific supports to help him sustain an
ordinary routine at home and at school. *Cf. Bennett v. Berryhill*, No. 2:17cv520, 2019 WL
1104186, at *13 (E.D. Va. Feb. 15, 2019) (substantial evidence did not support ALJ's finding
that claimant "did not require a significant degree of supervision in performing job tasks on a
consistent basis" in part because ALJ failed to explain how he weighed evidence that claimant
"received extra supervision by way of the structured education environment" and claimant's
mother provided an "extremely structured environment" at home so he could complete basic
chores), *adopted* 2019 WL 1102203 (E.D. Va. Mar. 8, 2019). In high school, Darrell spent about
one-third of his time in a self-contained classroom receiving "intensive instruction" on core
academic subjects in a "small group setting." R. 224. He was in a general-education classroom
for the rest of the time, but he still required additional support from an instructional assistant. R.
223–24; *see* R. 207. Darrell's IEP required teachers to check his agenda book "at the end of each
class to be sure he ha[d] the correct assignment written down." R. 217. Darrell "require[d] adult
supervision and guidance and [was] not yet able to live independently" at age eighteen. R. 296.
Almost a decade later, at age 26, he lived with his grandfather and still had never lived alone. His
grandfather had to remind him to do routine tasks like feeding the family dog. R. 54–55, 58. ALJ
Munday did not explain how she weighed *any* of this evidence in her RFC determination. Her

failure to do so requires reversal and remand. *See generally Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 663 (4th Cir. 2017).

IV. Conclusion

I take no position on whether Darrell is entitled to adult disability benefits. On remand, the Commissioner must consider and apply the applicable legal rules to all the relevant evidence in the record; explain how any material inconsistencies or ambiguities were resolved at each critical stage of the determination; and, assuming Darrell cannot prove he was disabled based on the medical evidence alone, provide a logical link between the evidence the Commissioner found credible and the RFC determination.

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** the Plaintiff's motion for summary judgment, ECF No. 14, **DENY** the Commissioner's motion for summary judgment, ECF No. 16, **REVERSE** the Commissioner's final decision, **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** the case from the Court's active docket.

**<u>Notice to Parties</u>**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the presiding United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to counsel of record.

ENTER: December 27, 2022

Joel C. Hoppe
United States Magistrate Judge